## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **JEANETTE T. MOORE,** **individually and as personal** **representative of the Estate of** **J.M., a minor,** | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) **CIVIL ACTION NO. 14-212-CG-C** ) |
| **CITY OF SELMA, ALABAMA,** *et* ***al.,*** | ) ) ) ) |
| Defendants. | |

### ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 24) and supporting exhibits, Plaintiff's ("Mrs. Moore's") response in opposition (Doc. 29) and supporting exhibits, and Defendants' Reply (Doc. 30) and supporting exhibits. The Court finds that both Officer Jonathan McGuire and Chief William T. Riley, III are entitled to qualified immunity. For the reasons set forth herein, Defendants' Motion for Summary Judgment (Doc. 24) is due to be **GRANTED**.

### STATEMENT OF THE FACTS

On May 10, 2012, J. M., a seventeen-year-old boy, got into an argument with his mother, Jeanette Moore, over household chores. J. M. took his stepfather's gun from a drawer and stormed out of the house. J. M.'s mother and stepfather called the police and, during the ensuing standoff,

police officer Jonathan McGuire ("Officer McGuire") fired a single shot, striking J. M. in the chest. The wound proved fatal. Jeanette T. Moore, acting as personal representatives of her son's estate, filed suit, seeking relief under both federal and state law. (Doc. 1). In her amended complaint, Mrs. Moore alleged that lethal force was unnecessary and excessive, and therefore, that Office McGuire deprived her son of his Fourth Amendment rights ("Count 1"). (Doc. 22). Moore also alleged several state law claims against both Officer McGuire and Chief Riley: (1) negligence against Officer McGuire ("Count 2"); (2) wantonness against Officer McGuire ("Count 3"); (3) assault and battery against Officer McGuire ("Count 4"); (4) negligence against Chief Riley ("Count 5"); (5) wrongful death against Officer McGuire ("Count 6") and the tort of outrage against Officer McGuire ("Count 7"). (Doc. 22).

On May 10, 2012, Mrs. Moore and her son, J. M., argued over chores that Mrs. Moore assigned J. M. (Doc. 22, ¶ 3; Exh. 4, p. 84; Doc. 25, Exh. 1). Upset because he did not want to complete the chores, J. M. began mumbling and complaining. (Doc. 22, ¶4). Mrs. Moore required J. M. to leave the house until he calmed down. (Doc. 22, ¶4).

J. M. left the house and walked up the street. (Doc. 22, ¶5).  A few minutes later, J.M. returned to the house and Mrs. Moore reiterated that he had to leave until he calmed down. (Doc. 22, ¶5). J. M. walked straight past his mother, entered her bedroom and locked the door behind him. (Doc. 22, ¶5).  Mrs. Moore asked J. M. to come out of her bedroom.  While in the

bedroom, J. M. removed a handgun, belonging to his stepfather, Roderick Moore ("Mr. Moore"), from a top drawer. (Doc. 25, Exh. 4, p. 95). After about a minute, J. M. came out of the bedroom carrying in the handgun in his right hand. (Doc. 22, ¶6; Doc. 25, Exh. 4, p. 96).  J. M. proceeded to the carport door (Doc. 22, ¶6). Mrs. Moore then told her daughter, Mon'Shaay Smith, and the children, Mrs. Moore's grandchildren, to leave because J.M. had a gun. (Doc. 25, Exh. 4, p. 96). J. M. left the home carrying the handgun and stopped in the front yard next to the fence.  (Doc. 22, ¶7). Mrs. Moore followed him and requested that he give her the gun. (Doc. 22, ¶7). J. M. refused, stating "that he felt as though he was being treated like a child and that nobody loved him." (Doc. 22, ¶7).

After unsuccessfully attempting to disarm J. M., Mrs. Moore asked Mr. Moore to call the police and request the Selma Police Department's assistance in disarming J. M. (Doc. 22, ¶9).   Mr. Moore called for police assistance, advising the dispatcher that J.M. had taken his gun. (Doc. 25, Exh. 5, p. 6; Doc. 25, Exh. 1). Mon'Shaay Smith, J.M.'s sister, also called 911 and requested police assistance. (Doc. 25, Exh. 1; Doc. 25, Exh. 7).

Meanwhile, J. M. repeatedly refused to relinquish the handgun and continued crying and stating "y'all ain't real with me" and other phrases that Ms. Moore was unable to understand.  (Doc. 22, ¶10).

In a matter of minutes of receiving the call, Officer Jonathan McGuire arrived at the Moores' home. (Doc. 22, ¶11; Doc. 25, Exh. 2, p. 62).  Officer

3

McGuire got out of his patrol car and did not turn on his VIDMIC. (Doc. 25, Exh. 2, p. 62). Officer McGuire walked up to the carport, where he met with Mr. Moore. (Doc. 25, Exh. 2, p. 55). Mr. Moore informed Officer McGuire about the events leading up to Officer McGuire's arrival. (Doc. 25, Exh. 2, p. 54; Doc. 22, ¶12). Specifically, that J.M. had a firearm and had threatened to kill everyone in the house. (Doc. 25, Exh. 2, p. 55). Mr. Moore told Officer McGuire that J.M. had walked to the left side of the house. (Doc. 25, Exh. 2, p. 55). Officer McGuire told Mr. Moore to "hang tight" and he would go check it out. (Doc. 25, Exh. 2, p. 55). Officer McGuire jogged to the other side of the house and during that jog, his VIDMIC fell off. (Doc. 25, Exh. 2, p. 56). Officer McGuire did not see J.M. and returned to Mr. Moore on the left side of the house. (Doc. 25, Exh. 4, pp. 57-58).

Mr. Moore, Mrs. Moore, and Officer McGuire then walked towards the backyard where J.M. was last seen and discovered that J. M. had jumped over the fence and was standing behind a storage unit in the adjacent neighbor's backyard. (Doc. 22, ¶12; Doc. 25, Exh. 2, p. 57). Still armed, J. M. then jumped back over the fence into his backyard. (Doc. 22, ¶13; Doc. 25, Exh. 5, p. 17). Officer McGuire asked J. M. to drop the weapon. (Doc. 22, ¶13; Doc. 25, Exh. 5, p. 17). J. M. did not drop the handgun and said that he did not "do anything" and was "not going anywhere." (Doc. 25, Exh. 5, p. 17). Both Mr. and Mrs. Moore asked J. M. to put down the gun. (Doc. 25, Exh. 4, p.41; Exh. 5, pp. 24, 25, 45). J. M. responded that he "was tired" and did not

"want to do this no more." (Doc. 25, Exh. 4, pp. 43, 112).

At this point, Officer McGuire removed his gun from the holster. (Doc. 25, Exh. 2, pp. 59 – 60). Officer McGuire ordered J.M. to drop the weapon three times. (Doc. 25 Exh. 1; Doc. 25, Exh. 4, p. 46). Suddenly, someone screamed causing J. M. to abruptly turn. (Doc. 25, Exh. 4, p. 47). Officer McGuire then fired a single shot, striking J. M. in the chest. (Doc. 25, Exh. 1; Exh. 4, p. 46; Exh. 2, p. 60). Once J. M. fell to the ground, Officer McGuire started running. (Doc. 25, Exh. 2, p. 60). Officer McGuire picked up his VIDMIC and continued to run towards the residence, calling for both backup and an ambulance. (Doc. 25, Exh. 1; Doc. 25, Exh. 2, p. 60).

Mrs. Moore began screaming "You shot him! You shot him!" and rushed to J. M., who was lying on his back. (Doc. 22, ¶16). J. M. had fluid draining from his mouth. (Doc. 22, ¶17). Officer McGuire's shot had struck an artery. (Doc. 25, Exh. 4, p. 146). Mrs. Moore, a nurse, leaned over J.M. and began CPR. (Doc. 22, ¶ 17). Mrs. Moore yelled at Officer McGuire that he had shot her only son and Officer McGuire began apologizing. (Doc. 22, ¶18). Within minutes, Selma police officers arrived at the scene, and one of the officers began assisting Mr. and Mrs. Moore in attempting to save J. M.'s life. (Doc. 22, ¶19).

Approximately ten to fifteen minutes after the additional officers arrived, an ambulance arrived and transported J. M. to the hospital. (Doc. 25, Exh. 4, p. 146). J. M. was pronounced dead at the hospital as a direct result of

the gunshot wound inflicted by Officer McGuire. (Doc. 22, ¶21; Doc. 25, Exh. 1).

At the scene, officers recovered the 9-millimeter Smith & Wesson handgun and a magazine with fifteen rounds of ammunition, which was in J. M.'s possession at the time of the shooting. (Exh. 1).

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324–25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. Id. at 322, 324–25. The party opposing a motion for summary judgment must rely on more than

6

conclusory statements or allegations unsupported by facts. <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir.1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. <u>Anderson</u>, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. <u>Beal v. Paramount Pictures Corp.</u>, 20 F.3d 454, 458–59 (11th Cir. 1994).

## LEGAL ANALYSIS

### A. Federal Claim

Mrs. Moore argues that Officer McGuire used excessive force when he shot J.M., depriving her son of a clearly established constitutional right. Mrs. Moore contends she is entitled to relief under 42 U.S.C. § 1983 because Officer McGuire used excessive force against her son, violating his Fourth Amendment rights.

In civil rights actions brought under § 1983, the doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Vineyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Harlow</u>, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a multi-step,

burden shifting qualified immunity analysis:

> In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.... Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.

Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted). In evaluating whether a plaintiff has met her burden, "[t]he threshold inquiry ... is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing Saucier, 533 U.S. at 201, 121 S.Ct. at 2156).

Mrs. Moore claims Officer McGuire violated J.M.'s Fourth Amendment right to be free from unreasonable seizure. See Lee, 284 F.3d at 1197. But, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). However, the level of force applied must not exceed that which a " 'reasonable officer would believe ... is necessary in the situation at hand.' " Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005) (quoting Lee, 284 F.3d at 1197).

The Fourth Amendment's "objective reasonableness" standard supplies the test to determine whether the use of force was excessive. Crenshaw v.

Lister, 556 F.3d 1283, 1290 (11th Cir. 2009). Accordingly, courts must

"careful[ly] balanc[e] ... the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing

governmental interests at stake." Graham, 490 U.S. at 396 (internal

quotation marks omitted). The Eleventh Circuit distilled from Supreme Court

jurisprudence several factors to aid our effort to "slosh ... through the

factbound morass of [this] 'reasonableness' " analysis. Scott, 550 U.S. at 383,

127 S.Ct. at 1778. The Eleventh Circuit highlights three factors set out by

Graham v. Connor:

> The analysis requires careful attention to the facts and
> circumstances of each particular case, including the severity
> of the crime at issue, whether the suspect pose[d] an
> immediate threat to the safety of the officers or others, and
> whether [the suspect] ... actively resist[ed] arrest or
> attempt[ed] to evade arrest by flight.

Crenshaw, 556 F.3d at 1290 (citation and internal quotation marks omitted).

A mechanical application of these factors, however, is not appropriate. See

Scott, 550 U.S. at 383. Instead, courts must be careful to evaluate the

reasonableness of an officer's conduct "on a case-by-case basis 'from the

perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight.' " Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th

Cir.1993) (quoting Graham, 490 U.S. at 396, 109 S.Ct. at 1872), modified, 14

F.3d 583 (11th Cir.1994). Further, the Supreme Court cautioned that "[t]he

calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97, 109 S.Ct. at 1872.

Use of deadly force indisputably implicates weighty individual interests. See Garner, 471 U.S. at 9. For over twenty years, Tennessee v. Garner has guided courts Fourth Amendment reasonableness analysis where officers used lethal force. However, the Supreme Court has explicitly cautioned against an interpretation of Garner as "a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' " Scott, 550 U.S. at 382. Instead, "Garner was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation." Id. (citation omitted). Accordingly, as set out in Garner, the use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force. See 471 U.S. at 11–12. Again, none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect. Scott, 550 U.S. at 382.

To satisfy the objective reasonableness standard imposed by the Fourth Amendment, Officer McGuire must establish that the countervailing

government interest was great. <u>See</u> <u>Crenshaw</u>, 556 F.3d at 1290. As noted above, analysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether J. M. posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest. <u>See</u> <u>id</u>. In this case, the reasonableness analysis turns on the second of these factors: presence of an imminent threat.

Both the first and third factors weigh in Officer McGuire's favor. Stealing a firearm, threatening the lives of others, and refusing to comply with the officer's commands to drop the weapon are undoubtedly serious crimes. <u>See</u> <u>Penley v. Eslinger</u>, 605 F.3d 834, 850-51 (11th Cir. 2010). The third factor favors a finding of reasonableness as well. Mrs. Moore does not dispute that J. M. refused to comply with the Officer's multiple commands to drop the weapon and surrender. J. M.'s noncompliance supports the conclusion that use of deadly force was reasonable. <u>See</u> <u>Garczynski</u>, 573 F.3d at 1168–69 (concluding that refusal to comply with repeated commands to show one's hands, to drop a cell phone, and then to drop the weapon pointed at the suspect's own head together justified officers' "escalation into deadly force").

This case turns on the second factor, whether J. M. posed an immediate threat to Officer McGuire and others.  Though a closer call, the second factor also supports Officer McGuire's argument that he acted reasonably under the circumstances. The government has a weighty interest

11

in protecting members of the public and police officers from the threat of force. See id. at 1166. Thus, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," use of deadly force does not violate the Constitution. Garner, 471 U.S. at 11 (noting that this is the case even where an officer uses deadly force merely to prevent the suspect's escape); see also Carr v. Tatangelo, 338 F.3d 1259, 1268 (11th Cir. 2003). The Eleventh Circuit Court clarified that the second factor can be reduced to a single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." Pace v. Capobianco, 283 F.3d 1275, 1281 (11th Cir. 2002).

J. M. demonstrated his dangerous proclivities by stealing his stepfather's gun, storming out of the house and refusing to comply with Officer commands to drop the weapon. Mrs. Moore claims that J. M. never pointed the weapon at Officer McGuire. Even if the Court construes this assertion as true, it does not change the outcome of this case. "[U]nder the law, the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." Pace v. Capobianco, 283 F.3d 1275, 1280 n. 12 (11th Cir. 2002). "[T]he question then is whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." Id. at 1281. Considering the circumstances surrounding the shooting, including the

12

threat J. M. posed to his own family and other officers if the standoff continued, this question must be answered "yes." See Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) (finding reasonableness when an officer shot and killed a mentally unstable man who attempted to steal a police cruiser).

Mrs. Moore disputes the immediacy of the harm that J. M. posed to bystanders, herself included, and Officer McGuire. She argues that J. M. was alone in a neighboring backyard, was 70 feet away and therefore, did not pose an immediate threat to Officer McGuire and the other bystanders. This argument is misplaced and a ruling along that line would set a dangerous precedent for future police interactions. Police should not have to wait until suspects fire or might fire a weapon before using deadly force. It is not the duty of the Court to conduct a 20/20 hindsight analysis of the circumstances. See Penley, 605 F.3d at 846. Rather, when examining whether an officer's use of deadly force is reasonable, Courts recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. So, "[w]e are loath to second-guess the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003). Though factual inferences are made in the Moores' favor, this rule applies only "to the extent supportable by the record." Scott, 550 U.S. at 381 n. 8. In this case, Officer McGuire was faced with a situation involving an armed young man, who repeatedly

13

disobeyed police commands to drop the gun. J. M. moved suddenly and Officer McGuire shot him. Under these circumstances, this Court is not inclined to second-guess this decision.

Even still, the relevant inquiry remains whether Office McGuire "had probable cause to believe that [J.M.] posed a threat of serious physical harm." See Robinson, 415 F.3d at 1256. In other words, would J.M. "have appeared to reasonable police officers to have been gravely dangerous"? See Pace, 283 F.3d at 1281. Recalling the incident, Officer McGuire stated in the affirmative that he feared for his life and that the lives others were in imminent danger during the standoff. (Doc. 25, Exh. 2, p. 73). Under the tragic circumstances of this case and in light of this Circuit's binding precedent, the Court must answer this question in the affirmative. The Court therefore holds that Officer McGuire did not violate J. M.'s constitutional rights, thereby ending the qualified immunity analysis. See Saucier, 533 U.S. at 201.

Even construing facts in a light most favorable to Mrs. Moore, the Court finds that there is no genuine dispute of material fact and the Court grants Officer McGuire's motion for summary judgment on the § 1983 claim.

**B. State Law Claims**

Mrs. Moore also alleges the following state-law claims against Officer McGuire and Chief Riley: (1) negligence against Officer McGuire (Count 2); (2) wantonness against Officer McGuire (Count 3); (3) assault and battery

against Officer McGuire (Count 4); (4) negligence against Chief Riley (Count 5); (5) wrongful death against Officer McGuire (Count 6); and (6) outrage/emotional distress against Officer McGuire. (Count 7).

## 1. Negligence, wantonness and wrongful death

Plaintiff claims that Officer McGuire negligently and wantonly deprived her son of his Constitutional rights by shooting J.M. without legal justification. (Doc. 22, pp. 6 -8, ¶¶ 39, 45). Officer McGuire claims that he is entitled to qualified immunity from the state law claims asserted against him.

Alabama law recognizes at least two types of immunity from suit or liability for the individual executive acts of public officers.  Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998).  The first is absolute "state-agent" immunity, which is afforded to certain state constitutional officers. Id. The second type of immunity, described as "discretionary function" immunity, is not absolute and applies when a state officer or employee commits a tort while engaged in the exercise of a discretionary function.  Taylor v. Shoemaker, 605 So.2d 828, 831 (Ala. 1992) (citing Sellers v. Thompson, 452 So.2d 460 (Ala. 1984).

The relevant Alabama statute establishing discretionary function immunity is Ala. Code 6-5-338(a) (1975), which reads:

> Every peace officer…who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof…shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

15

Under the discretionary function immunity analysis, the threshold requirement is determining whether Officer McGuire was performing a discretionary function when the alleged wrong occurred. Wood v. Kesler, 323 F.3d 982, 883 (11th Cir. 2003). Discretionary acts are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Id. at 2. See also L.S.B. v. Howard, 659 So.2d 43, 44 (Ala. 1995). If the court finds that McGuire was performing a discretionary function, then the burden shifts to Mrs. Moore to demonstrate that McGuire acted in "bad faith, with malice or willfulness." See Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003); See also Sheth, 145 F.3d at 1238-1239. "Acts of such a nature are not considered to be discretionary." Wright v. Wynn, 682 So.2d 1, 2 (Ala. 1996).

Here, Officer McGuire arrived at the house, within the scope of his duties, to diffuse an intense family situation. When J. M. refused to disarm, a standoff ensued, resulting in Officer McGuire shooting J.M. The Court finds that McGuire's shooting of J.M. was a discretionary act within the scope of his employment for immunity purposes. See Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala. 2006) (explaining that state-agent immunity applies when the agent is "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under

16

circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975"); see also Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000). But cf. Mann v. Darden, 630 F.Supp.2d 1305, 1318 (M.D. Ala. 2008) ("using an unreasonable amount of force is not within the discretion of an officer" (internal citation omitted)). Therefore, McGuire established his entitlement to immunity based on the allegations of the Amended Complaint—*i.e.* that he was exercising discretion and judgment.

Alabama Code § 6-5-338 extends immunity to a municipal police officer unless his actions were conducted in bad faith. See Cranman, 792 So.2d at 405 (holding that a State agent is not entitled to immunity "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law"). Thus, to recover Mrs. Moore needs to demonstrate that Officer McGuire acted in bad faith, with malice or willfulness in shooting J.M. See Wood, 323 F.3d at 883.

Mrs. Moore's response to Defendant's motion for summary judgment states outright "Officer McGuire was acting in line and in the scope of his duties as a law enforcement officer, as the Defendants state, for the City of Selma." (Doc. 29, p. 7). Mrs. Moore's arguments then center around whether or not J.M. pointed the weapon at Officer McGuire, which, as explained above, does not change Officer McGuire's immunity. As to the issue of bad faith, Mrs. Moore claims Officer McGuire acted with ill will in shooting J.M. Yet, Mrs. Moore's response lacks legal authority for the proposition that

17

shooting an armed suspect immediately amounts to bad faith.[1]

The Court finds that Officer McGuire's actions under the circumstances fall in line both with Alabama law and the Selma Police Department's policies. Alabama law allows an officer to use deadly force "when and to the extent that he reasonably believes it necessary in order…to defend himself or a third person from what he reasonably believes to be in the use or imminent use of deadly physical force." Ala. Code § 13A-3-27 (1975). Furthermore, Officer McGuire's actions also fall in line with the Selma Police Department's policy on the use of deadly force. That policy states that officers "are authorized to fire their weapons in order to: (a) protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm." (Doc. 25, Exh. 3, ¶ 3.11.19).

Officer McGuire is entitled to discretionary immunity and there is no evidence of bad faith that would negate that immunity. Therefore, the Court finds that Officer McGuire is entitled to summary judgment on the state-law claims of negligence (Count 2), wantonness (Count 3), and wrongful death (Count 6).

## 2. Assault and Battery Claims against Officer McGuire

As mentioned above, Alabama also recognizes state-agent immunity. See Sheth v. Webster, 145 F.3d at 1236. Under Alabama's state-agent

---

[1] Rather, the response repetitiously states that Officer McGuire shot J.M. and fails to offer any legal arguments supported by statutory or case law.

immunity doctrine:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's ...
>
> (2) exercising his or her judgment in the administration of a department or agency of government [or] ...
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; ...
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000); Ex parte Butts, 775 So.2d

173, 177–78 (Ala. 2000) (majority of court adopting Cranman restatement).

The Cranman restatement of state-agent immunity includes all

circumstances entitling officers to immunity under Ala. Code § 6–5–338(a).

See Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala.2006).

State-agent immunity does have important limitations, which the

Alabama Supreme Court recognized as:

> "[However,] a State agent shall not be immune from civil liability in his or her personal capacity

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000).  The test for state-agent immunity is analogous to federal qualified immunity. Brown v. City of Huntsville, Ala., 608 F.3d 724, 741 (11th Cir. 2010). "If the State agent makes such a showing [of state-agent immunity], the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006). Under Alabama law, a state employee is entitled to substantive immunity from intentional torts if his or her actions fall within the exercise of a discretionary function. Parker v. Downing, 547 So.2d 1180, 1184 (Ala. Civ. App. 1988) (extending substantive immunity to intentional torts).

Officer McGuire is immune from suit when "exercising judgment in the enforcement of the criminal laws of the State, including ... arresting or attempting to arrest persons." Ex parte Cranman, 792 So.2d at 405. As discussed at length above, Officer McGuire acted within his capacity as a Selma police officer and, acted objectively reasonably to apprehend J.M. Recalling the stand-off, Officer McGuire stated that J.M. "was steadily

showing aggression" and refused to drop the weapon despite commands to do so. (Doc. 25, Exh. 2, p. 60). Officer McGuire stated J.M repeatedly threatened to "burn his ass" and that J.M. kept repeating that he did not "give a fuck about the police." (Id. at p. 73). As the Court described in Section A, Officer McGuire's use of deadly force was reasonable under the circumstances and he was acting in his discretion in accordance with both the law and the policies of the Selma Police Department.  There is no showing of bad faith or malicious intent in the shooting. Officer McGuire has state-agent immunity for his action of shooting J.M. because he was "exercising judgment in the enforcement of the criminal laws of the State," and there is no evidence of bad faith or malicious intent. Therefore, Mrs. Moore's assault and battery claims against Officer McGuire also fail.

### 3. Tort of Outrage

Count 7 of the Amended Complaint asserted a claim for the tort of outrage/intentional infliction of emotional distress. (Doc. 22). The basic standard for the tort of outrage is, "the conduct made the basis of the claim must have been so outrageous in character and so extreme in degree as to be regarded as atrocious and utterly intolerable in a civilized society." Newton v. Town of Columbia, 695 So.2d 1213, 1218 (Ala. Civ. App. 1997) (internal quotes omitted). Conduct meeting this stringent standard is "rare." Jenkins v. United States Fid. & Guaranty Co., 698 So.2d 765, 768 (Ala. 1997). Officer McGuire argues this is not one of those rare cases. (Doc. 25 at 22-23).

21

In order to recover, a plaintiff must demonstrate that the defendant's conduct  " '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.' " Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 44 (Ala. 1990) (citing Am. Road Serv. Co. v. Inmon, 394 So.2d 361 (Ala. 1980)); see also Potts v. Hayes, 771 So.2d 462, 465 (Ala. 2000).

The Alabama Supreme Court has held that the tort of outrage is so limited, that it recognized it in regard to only three kinds of conduct: "(1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So.2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, Nat'l Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So.2d 322 (Ala. 1989)." Little v. Robinson, 72 So. 3d 1168, 1172-73 (Ala. 2011)

However, the tort of outrage is not limited to those scenarios. Recently, the Alabama Supreme Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. See O'Rear v. B.H., 69 So.3d 106 (Ala. 2011). It is clear, however, that the tort of outrage is viable only when the conduct is "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as

22

atrocious and utterly intolerable in a civilized society.'" Horne v. TGM
Assocs., L.P., 56 So.3d 615, 631 (Ala. 2010) (quoting Inmon, 394 So.2d at 365).
This case arises from the tragic loss of a young life, but even construing the
facts in a light most favorable to the plaintiff, the Court finds that she cannot
recover under the tort of outrage.

Even in cases of excessive force, that alone does not trigger the
"extreme and outrageous" requirement. See McCray v. City of Dothan, 169
F.Supp.2d 1260, 1300 (M.D. Ala. 2001) (officers' actions of attacking plaintiff
in presence of his children, choking him, falsely arresting him, and leaving
his distraught children with strangers was unseemly, but not so extreme in
degree as to go beyond all possible bounds of decency, and to be regarded as
atrocious and utterly intolerable in a civilized society); Newton v. Town of
Columbia, 695 So.2d 1213, 1218 (Ala. Civ. App. 1997) (assault by officer does
not "necessarily constitute[ ] extreme and outrageous conduct sufficient to
support an action for intentional infliction of emotional distress.") Defendants
made an adequate showing that the essential elements of the tort are absent
from Mrs. Moore's allegations. Mrs. Moore had an affirmative duty to respond
to demonstrate the existence of genuine issues of material fact. Instead, Mrs.
Moore's brief repeated the elements of immunity and stated, "Officer
McGuire was acting under the color of law and within his discretionary
functions at the time of the incident involving [J.M.]." (Doc. 29, p. 13). Mrs.
Moore's argument fails to coherently articulate how the Officer's actions rise

to the level of tort of outrage. Particularly, it is unclear to this Court how an officer's actions can be entirely "within the color of the law" (Doc. 29, p. 13), yet also simultaneously rise to conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." Horne, 56 So.3d at 631. Therefore, on the authority and argument presented, the Court concludes that Officer McGuire's conduct is insufficient as a matter of law to support a claim for the tort of outrage.

Accordingly, McGuire's motion for summary judgment is **granted** as to the state law claims against Officer McGuire.

### 4. Claims Against Chief Riley

Moore also brought suit against Chief William Riley in his official capacity as Chief of Police for the City of Selma. In her amended complaint, Mrs. Moore asserts Chief Riley negligently trained and supervised Officer McGuire and should be held responsible for her son's death. (Doc. 22, p. 9).

For years, federal courts in Alabama routinely held that there was no cause of action against a municipality for its supervisors' negligent hiring, supervision, and training of subordinate employees under Alabama law. See Borton v. City of Dothan, 734 F.Supp.2d 1237, 1258–59 (M.D. Ala. 2010) (finding that Alabama does not recognize a cause of action against a supervisor or municipality for negligent supervision/training/hiring; see also Grider v. City of Auburn, 628 F.Supp.2d 1322, 1351–52 (M.D. Ala. 2009); Hamilton v. City of Jackson, 508 F.Supp.2d 1045, 1058 (S.D. Ala. 2007); Doe

v. City of Demopolis, 799 F.Supp.2d 1300, 1310–11 (S.D. Ala. 2001). A recent Alabama Supreme Court decision, Ex Parte Montgomery, 99 So.3d 282 (Ala. 2012), casts doubt on this proposition. See Hughes v. City of Montgomery, 2013 WL 5945078 at *3, (M.D. Ala. Nov. 6, 2013). However, the holding of Ex Parte Montgomery is not clear and is not persuasive for the Court to depart from long held, existing precedent.

Mrs. Moore's brief lacks legal authority to support the proposition that supervisors may be held liable for negligent training, hiring, or supervision. Rather, Mrs. Moore's brief repeats the summary judgment standard and ironically, cites case law stating, "conclusory allegations without specific supporting facts have no probative value." Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985); see also, Gordon v. Terry, 684 F.2d 736, 744 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983). Mrs. Moore's brief restates that Officer McGuire shot J. M. in the backyard. However, at no point, does the brief draw a coherent connection between Chief Riley's actions and the shooting. Mere conclusory statements have no probative value. Therefore, Chief Riley is entitled to summary judgment on the claim of failure to train and supervise.

## CONCLUSION

The loss of such a young life is an undeniable tragedy. However, with her suit, Mrs. Moore asks the Court to conduct precisely the type of 20/20 hindsight inquiry which the Supreme Court and the Eleventh Circuit have

repeatedly cautioned against. Therefore, based on the foregoing, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 25) is

hereby **GRANTED.**

      **DONE and ORDERED** this 6th day of July, 2015.

                  /s/  Callie V. S. Granade
                  UNITED STATES DISTRICT JUDGE